LARA YERETSIAN (SBN 194110)
Yeretsian Law
450 North Brand Boulevard
Glendale, California 91203
Tel: 818-741-1220
Fax: 818-441-5296
Email: firm@laralaw.com

Attorney for Defendant
ARTASHES DARBINYAN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. CR-15-558-SVW |
| ) | |
| Plaintiff, ) | **DEFENDANT'S OBJECTIONS** |
| v. ) | **TO THE PSR AND POSITION RE:** |
| ) | **SENTENCING, WITH EXHIBITS** |
| ARTASHES DARBINYAN, ) | |
| ) | Sentencing Date: August 21, 2017 |
| ) | Time: 11:00 a.m. |
| Defendant. ) | Court: Hon. Stephen V. Wilson |
| ) | |

Defendant ARTASHES DARBINYAN, through counsel, hereby submits his Objections to the Presentence Investigation Report and Position with Respect to Sentencing, with Exhibits.

Defendant, through counsel, reserves the opportunity to make additional comments and arguments at the sentencing hearing in this matter.

Date: August 7, 2017          Respectfully submitted:

By _____/s/_____
LARA YERETSIAN
Attorney for Defendant
ARTASHES DARBINYAN

1

# I.

# INTRODUCTION

On December 12, 2016, Artashes Darbinyan, age 37, pleaded guilty to one count of mail fraud in violation of 18 U.S.C. §1341 and 18 U.S.C. §2, and one count of conspiracy to launder money instruments in violation of 18 U.S.C. §1956(h). The charges stem from Mr. Darbinyan's participation in a mass-mailing operation offering trademark protection services to trademark applicants. Over 4,000 applicants responded to the offer and each paid $385.00 for services that were not provided. The total loss amount stipulated by the parties in the plea agreement is $1,661,570, which is just over the $1,500,000 threshold that triggers a 16, rather than 14, level enhancement for loss. While the loss amount falls in the mid-range of the advisory guidelines loss table, it is submitted that no *individual* victim suffered serious economic loss, since no entity lost more than $385.00.

While consulting with Mr. Darbinayan, undersigned defense counsel discovered that he has struggled with drug and alcohol abuse for many years and that the peak of his addiction coincided with the time when he was involved in the instant offense. His earlier misdemeanor convictions also occurred during periods that the defendant was using drugs and alcohol heavily.

Mr. Darbinyan began drinking alcohol as a teenager when he was living alone in his hometown of Yerevan, Armenia. He was introduced to cocaine and other drugs much later in California, after he completed college at the University of California, Irvine (UCI) in 2007. Mr. Darbinyan continued to abuse drugs and alcohol even after his arrest in September 2015. Upon entering his guilty plea in the instant matter in December 2016, he began regular treatment with Sam W. Mulembo, Ph.D., a psychologist in Monrovia, California. Mr. Darbinyan entered an outpatient rehabilitation program on April 19, 2017 and he has been sober since that day. He later enrolled in an intensive outpatient program at Aurora Las

Encinas Hospital in Pasadena on July 19, 2017.  He attends sessions there every Monday, Wednesday and Thursday from 6 p.m. to 9:20 p.m.  Mr. Darbinyan has been subject to random drug testing 2-3 times per week as a condition of his pretrial supervision, and he has consistently tested clean since April.

Last month, Mr. Darbinyan was referred for psychiatric assessment to psychiatrist Saul J. Faerstein, M.D., who has prepared an evaluation and background report (attached).  Dr. Faerstein has been practicing since the late 1960s and is certified by the American Board of Psychiatry and Neurology.  He has decades of experience in forensic psychiatry, as a practitioner and mentor, and is a leading expert in the field.  In his attached evaluation, Dr. Faerstein offers numerous salient observations on the defendant's longstanding struggles with substance abuse, particularly with regard to how this history pertains to the instant matter.

Despite his long history of chemical dependency, Mr. Darbinyan earned a Bachelor's degree in Business Economics at the University of California, Irvine and he was on his way to leading a productive life before becoming derailed by drug and alcohol abuse.  Although he has incontestably made a series of very bad decisions, Mr. Darbinyan is not beyond redemption.  Quite the contrary, he is a late-maturing young man who has made serious errors in judgment that he thoroughly regrets and has sworn never to repeat.

Given these factors, with particular emphasis placed on Mr. Darbinyan's history and characteristics as outlined below, the defendant, through counsel, respectfully requests a non-guideline sentence of 60 months imprisonment.  It is understood that he will be ordered to pay full financial restitution of approximately $1.6 million, that he will be ordered to undergo a lengthy period of supervised release following incarceration, and that he may also be required to pay a fine and

fulfill a community service obligation.  Mr. Darbinyan has already paid $65,000 in restitution prior to sentencing.

## II.

## ACCEPTANCE OF RESPONSIBILITY AND PAYMENT MADE TOWARD RESTITUTION

Art Darbinhyan accepted responsibility from an early stage of these proceedings.  He recognizes that he seriously compromised his talent as an entrepreneur and software designer in a misguided attempt to earn quick money to support his substance abuse problem.  Art is anguished and ashamed that he has brought this disaster on himself and his family, and his contrition is genuine. As he acknowledged in his written statement to the Probation Officer (See PSR, ¶25):

> I would like to apologize to all of the people that I have deceived.  My behavior was reckless and selfish.  For that I am sorry… It has made me take a long look at myself and the choices I have made.  I have been before in treatment, two times in rehab, and I am now… taking some focus classes that have helped me find my higher power and has helped me to understand other people's problems…
>
> I would like to apologize to my family as well.  I have been so selfish and chose to try to deceive companies through the crimes I committed.  I cared more about what I needed.  I now realize how many people that I have harmed.

It is understood that deeds are more important than words in determining a defendant's remorse.  Yet most of the people who have interacted with this man in

1  recent months have come away with a sense that his regret and desire to make

2  things right are sincere.  This commitment is further seen in the considerable

3  restitution he has paid, amounting to approximately $65,000 so far.  As the Court is

4  aware, the majority of defendants do not pay any restitution until they have been

5  sentenced and are subject to court-mandated collection proceedings.

6       In the complex human equation of sentencing, the Court is asked to factor in

7  Defendant Artashes Darbinyan's remorse and willingness to take responsibility,

8  and his post-offense rehabilitation which includes his voluntary initiation of

9  restitution payments.  These circumstances, along with the §3553(a) criteria, are

10  every bit as relevant to the sentencing calculus as the advisory guidelines and they

11  weigh in support of the requested sentence of 60 months incarceration.

### III.

### OBJECTIONS TO THE PRESENTENCE REPORT AND COMMENTS ON THE ADVISORY GUIDELINES

15       In the Plea Agreement, the parties stipulated to a total offense level of 28.

16  The calculation is derived from a base offense level of 7 for mail fraud [U.S.S.G.

17  §2B1.1(a)]; a 16-level increase for loss of more than $1,500,000 [U.S.S.G.

18  §2B1.1(b)(1)(I)]; a 2-level increase for offense committed through mass marketing

19  [U.S.S.G. §2B1.1(b)(2)(A)(ii)]; a 2-level increase for sophisticated means

20  [U.S.S.G. §2B1.1(b)(10)(C)]; and a 2-level increase for possession and use of

21  authentication feature [U.S.S.G. §2B1.1(b)(11)(A)(ii)]. This calculation, combined

22  with a base offense level of 29 for money laundering [U.S.S.G. §2S1.1(a)(1)] and a

23  2-level increase for conviction under 18 U.S.C. §1956 [U.S.S.G. §2S1.1(b)(2)(B)],

24  produces an adjusted offense level 31.  Subtracting 3 levels for timely Acceptance

25  of Responsibility [U.S.S.G. §3E1.1(a) & (b)] results in a total offense level of 28.

26       In the Presentence Investigation Report (hereinafter PSR), the Probation

27  Officer's guidelines calculations align with the Plea Agreement with two major

28

exceptions.  The PSR proposes adding a 2-level specific offense characteristic for sophisticated laundering [U.S.S.G §2S1.1(b)(3)] and  then recommends an additional 4-level increase for role in the offense, pursuant to U.S.S.G. §3B1.1(a), cumulatively yielding a total offense level of 34.[1]  At criminal history category III, as calculated by the Probation Officer, Mr. Darbinyan would face a draconian advisory guideline range of 188 to 235 months.[2]

As set forth herein, Mr. Darbinyan objects to the following assertions in the Presentence Report: 1) that he should receive the two-level specific offense characteristic for sophisticated laundering; 2) that he should receive the four-level upward adjustment for role in the offense; and 3) that he should be sentenced within Criminal History Category III.  Mr. Darbinyan respectfully suggests that his total offense level should be 28 and that his criminal history category should be II. This calculation would result in an advisory guideline range of 87 to 108 months, though the defendant believes the proper term of imprisonment, once all of the §3553(a) factors are weighed, is 60 months.

A.   *Mr. Darbinyan Objects To The Allegation That He Should Receive A Two-Level Enhancement For Sophisticated Laundering*

U.S.S.G. §2S1.1(b)(3) provides for a two-level enhancement when a defendant engaged in "sophisticated laundering," and is convicted under 18 U.S.C. §1956. The Guidelines define "sophisticated laundering" as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. §1956 offense." U.S.S.G. §2S1.1, note 5(A). According to the commentary, "sophisticated laundering" typically involves the use of fictitious entities; shell corporations; two or more levels of transactions, transportation, transfers, or

---

[1] PSR, page 12, ¶42.

[2] Probation Officer's Recommendation Letter at page 6, and PSR at page 15, ¶ 60.

transmissions, involving criminally derived funds that were intended to appear legitimate; or offshore financial accounts. However, the commentary to the Guidelines makes clear that when "the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, *do not apply [the sophisticated laundering] guideline*." U.S.S.G. §2S1.1, Application Note 5(B) (emphasis added).

In the PSR, the U.S. Probation Office asserts that the sophisticated laundering enhancement applies to Mr. Darbinyan's case because "the scheme involved unlawfully using other people's identities for the bank accounts in order to make it more difficult to identify the real people behind the scheme." (PSR ¶39.) The Probation Office further asserts that "all of the funds were withdrawn in the form of cashier's checks and wire transfers to gold dealers and cash, which made the unlawful proceeds untraceable." (PSR ¶39.)

Here, the sophisticated laundering enhancement does not apply because the conduct that forms the basis for this enhancement is entirely subsumed in various other enhancements that are applicable under the fraud guideline. [See U.S.S.G. §2S1.1, note 5(b).] Specifically, in the Plea Agreement, the parties stipulated that Mr. Darbinyan was subject to a two-level increase for use of an authentication feature because he used false identification documents in furtherance of the scheme. (PSR ¶¶5, 39.) Penalizing Mr. Darbinyan a second time for using false identifications in the course of the scheme is entirely duplicative, and cannot form the basis for the sophisticated laundering enhancement.

Furthermore, the parties already stipulated in the Plea Agreement (see page 12, line 11) that Mr. Darbinyan was subject to a two-level "sophisticated means" enhancement under U.S.S.G. §2B1.1(b)(10)(C) for engaging in what the Probation Office defines in the PSR as "especially complex or especially intricate offense

conduct pertaining to the execution or concealment of an offense." (PSR ¶¶33-34; see also U.S.S.G. §2B1.1(b)(10)(c), Application Note 9(B).) The use of cashier's checks and wire transfers to gold dealers and cash is conduct that was plainly meant to effectuate and conceal the underlying mail fraud offense. Thus, Mr. Darbinyan objects to the application of the "sophisticated laundering" enhancement as impermissible double counting, contravening U.S.S.G. §2S1.1, Application Note 5(b).

B.   *Mr. Darbinyan Objects To The Allegation That He Should Receive A Four-Level Upward Adjustment For Role*

As set forth in U.S.S.G. §3B1.1, a defendant's offense level should be adjusted based on the defendant's role in the offense as follows:

(a)   If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b)   If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c)   If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

However, Note 3(c) of the commentary to §2S1.1 limits the application of the role adjustment in cases in which U.S.S.G. §2S1.1(a)(1) (Money Laundering) applies and there is only one underlying offense, stating: "[T]he application of any chapter three adjustment shall be determined based on the offense covered by this guideline (i.e. the laundering of criminally derived funds) *and not on the underlying offense from which the laundered funds were derived*."   U.S.S.G. §2S1.1(a)(1), Application Note 3(c) (emphasis added).

8

Moreover, to sustain a finding that a defendant qualifies for one of the specified aggravated roles set forth in §3B1.1, there must be evidence that the defendant "exercised control or was otherwise responsible for organizing, supervising, or managing others in the commission of the offense." United States v. Mares-Molina, 913 F.2d 770, 773 (9th Cir. 1990). This is not a "but-for" test.  See United States v. Harper, 33 F.3d 1143, 1151 (9th Cir. 1994), cert. denied 15 S. Ct. 917 (1995). The fact that a defendant may have played a key role in the criminal activity is insufficient to justify a §3B1.1 enhancement in the absence of evidence that the defendant occupied one of the roles listed under §3B1.1. See id. at 1150-51; United States v. Hoac, 990 F.2d 1099, 1110-11 (9th Cir. 1993) ("[T]he defendant must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime."). Further, it is not enough to show "merely that the defendant was more culpable than others who participated in the crime." Harper, 33 F.3d at 1150. Instead, the government must show that the defendant exercised "control over others involved in the commission of the offense [or] . . . responsib[ility] for organizing others for the purpose of carrying out the crime[.]" See Mares-Molina, 913 F.2d at 773; see United States v. Anderson, 895 F.2d 641, 646 (9th Cir. 1990) (defendant "gave specific instructions and planned their conduct throughout the course of the enterprise."). The law mandates proof of "*specific facts* that indicate [the defendant] exercised control over or organized others in committing this crime." Harper, 33 F.3d at 1150 (emphasis added).

Here, Mr. Darbinyan's base offense level with respect to money laundering was calculated pursuant to §2S1.1(a)(1), see Plea at ¶17, and he was involved in only one underlying offense—mail fraud. Thus, in order to determine whether a role adjustment is applicable in this case, the Court must determine whether Mr. Darbinyan played a leading role *with respect to the laundering of criminally*

*derived funds*—not the underlying mail fraud scheme. See U.S.S.G. §2S1.1(a)(1), Application Note 3(c) (emphasis added).

In the PSR, the Probation Office asserts that Mr. Darbinyan should receive a four-level enhancement for role in the offense because he "initiated this extensive money laundering scheme." (PSR ¶42.) In support of its assertion, Probation states that "Darbinyan instructed co-conspirators to collect payments at virtual office centers" and "creat[ed] websites, VOIP phone numbers, bogus email accounts, prepaid wireless modems and fraudulent California driver's licenses, in order to disguise his control over the scheme." (PSR ¶42.) However, these facts all relate to the underlying mail fraud scheme—rather than money laundering—and thus, do not bear on whether the Chapter 3 role adjustment is appropriate in this case.

Moreover, Probation's observation that Mr. Darbinyan "initiated" the scheme does not rise to the level necessary to justify a role enhancement, which requires the showing of specific facts indicating that the defendant was an organizer or leader that exercised control over the other criminally culpable members involved in the money laundering. The PSR provides no evidence that Mr. Darbinyan played a leading or managerial role over others in the laundering of these funds. On the contrary, the factual basis to the Plea Agreement, merely states that Mr. Darbinyan's role in the laundering portion of the scheme was as follows: "After depositing the victims' payments into the bank accounts that had been opened with identities of other people, the defendant and co-conspirators laundered the funds by withdrawing them through cash withdrawals or cashier's checks and then purchasing gold." Plea at ¶15(d). The Probation Office offers no specific facts indicating that Mr. Darbinyan exercised control over or organized others in committing this crime. As such, the four-level adjustment for role in the offense is inappropriate here.

10

*C.* *Mr. Darbinyan Objects To The Allegation That He Should Be Placed Within A Criminal History Category Of III*

The Probation Office calculates that Mr. Darbinyan has six criminal history points, putting him in a Criminal History Category of III. Four of those criminal history points derive from minor misdemeanor offenses, including a 2008 conviction for reckless driving in violation of Vehicle Code §23103 (Case No. 8GN03210); a 2012 conviction for reckless driving in violation of Vehicle Code §23103 (Case No. 2BR01127); a 2014 conviction for driving without a license in violation of Vehicle Code §12500(a) (Case No. 4BR01048); and a 2008 misdemeanor for mail solicitation in violation of Business & Professions Code §17533.6(b)(1). (PSR ¶¶54-57.) Additionally, Probation added two more points pursuant to U.S.S.G. §4A1.1(d) because Probation asserts that the instant offense was committed while Mr. Darbinyan was on unsupervised probation in Case Numbers 2BR01127 and 4BR01048. (PSR ¶59.)

Under U.S.S.G. §4A1.2(c), "Sentences for [certain prior offenses] and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense[.]" U.S.S.G §4A1.2(c). The Guidelines specifically provide that a sentencing court may depart downward if the applicable criminal history category "substantially over-represents the seriousness of a defendant's criminal history or the likelihood that a defendant will commit other crimes…" U.S.S.G. §4A1.3: See also United States v. Flores-Uribe, 106 F.3d 1485, 1487 (9th Cir. 1997) (implicitly recognizing District Court's authority to make a horizontal departure); United States v. Brown, 985 F.2d 478, 481-82 (9th Cir. 1993 (recognizing power to depart downward to correct for criminal history score that overstates the seriousness of criminal history, quoting U.S.S.G. §4A1.3).

11

In determining whether a defendant's criminal history is overrepresented, courts may consider the following factors: (1) the age of the prior convictions; (2) the defendant's age at the time of the priors; (3) whether drug and alcohol use were involved in the priors; (4) the circumstances of the prior offenses; (5) the length of the prior sentences; (6) the circumstances of the defendant's life at the time of the priors; and (7) the proximity of the priors. See United States v. Hammond, 240 F.Supp.2d 872, 877-80 (E.D. Wisc. 2003).

In the instant case, the PSR indicates that Mr. Darbinyan's prior convictions were for misdemeanors, mostly with no connection to the instant case.  Although one of the prior offenses involved misdemeanor mail solicitation, that offense is remote in time, occurring nearly ten years ago in 2008. Furthermore, none of Mr. Darbinyan's prior offenses involved major transgressions or violence.

An additional relevant factor that weighs in favor of over-representation is that the prior offenses were committed while the defendant was under the influence of drugs or alcohol. See Hammond, 240 F.Supp.2d at 878 (citations omitted); see also United States v. Hammond, 37 F.Supp.2d 204, 205 (E.D.N.Y. 1999) (departing from category VI to III where defendant "had no history of violent behavior [and his] prior arrests resulted from minor drug crimes associated with a poor addict's attempt to acquire money for the purchase of narcotics"); United States v. Lacy, 99 F.Supp.2d 108, 119 (D.Mass. 2000) (departing where defendant's record was "largely non-violent, and relatively minor, the kind that characterizes an out-of-control addict").

Here, as discussed in detail in the PSR, in this sentencing memorandum, and in the attached evaluation of Dr. Faerstein, Mr. Darbinyan's criminal history is tied in no small part to his struggles with addiction. (PSR ¶¶74-78).  Mr. Darbinyan began consuming alcohol when he was a teenager and later used cocaine and opiates. Notably, his first convictions occurred in 2008, after his graduation from

1  UC Irvine and during the onset of one of his peak periods of drug use.  Given that

2  his criminal history is non-violent in nature, and is inextricably tied to his battle

3  with substance abuse, a departure in this case is warranted.

4      Another relevant consideration in the instant case is the length of the prior

5  sentences. <u>Hammond</u>, 240 F.Supp.2d at 877. Here, Mr. Darbinyan never served

6  any jail time for the four offenses at issue, and in each case was simply placed on

7  informal, or summary, probation. All four convictions were so minor that jail time

8  was not deemed necessary to correct his behavior.

9      In sum, Mr. Darbinyan's criminal history depicts a man who has struggled

10 with substance abuse, resulting in several minor misdemeanors. Placement in

11 Criminal History Category III would overrepresent his criminal history and the

12 Court is respectfully asked to depart downward, or laterally, to Category II.

13 D.    *<u>The Substantially Overlapping Enhancements Proposed In The Presentence</u>*

14 *<u>Report Would Unduly Skew The Advisory Guidelines</u>*

15     Adding the enhancements sought by the Probation Office for aggravated role

16 (+4) and sophisticated laundering (+2) on top of the already steep 16-level increase

17 derived from loss amount, §2B1.1(b)(1)(I), would vastly and disproportionately

18 skew Mr. Darbinyan's guidelines.  Sentencing courts have recognized "that when

19 the addition of *substantially overlapping enhancements* result in a significant

20 increase in the sentencing range minimum, a departure may be considered."

21 <u>United States v. Lauersen</u>, 362 F.3d 160, 164 (2d Cir. 2004) (emphasis in original)

22 *(Lauersen II), vacated*, <u>Lauersen v. United States</u>, 543 U.S. 1097 (2005).

23     Based on the 16 level increase for loss amount applied in the Presentence

24 Report, the 2 level proposed increase for sophisticated laundering, and the 4 level

25 proposed role adjustment, the resulting overall Guidelines calculation in the PSR

26 has become unhinged from the now-established first principle of sentencing: that

27 the sentence imposed be "sufficient, but not greater than necessary to comply with

28

the purposes" of sentencing.  18 U.S.C. §3553(a).  The loss table enhancement and proposed enhancements completely overwhelm all other pertinent Guidelines considerations.

A sentencing court's authority "to reject…the advice of the Guidelines," Kimbrough v. United States, 552 U.S. 85, 113 (2007) (Scalia, J., concurring), has particular relevance here.  The §2B1.1 fraud table, along with its many related specific offense characteristics, is a blunt instrument ill-suited to the wide range of financial crimes to which it applies.  Moreover, "the guidelines' fetish with abstract arithmetic" fails to take account of the devastating effect "that guideline calculations can visit on human beings if not cabined by common sense."  United States v. Adelson, 441 F.Supp. 2d 506, 512 (S.D.N.Y. 2006).  The human impact of this "fetish with abstract arithmetic" has over the years been magnified by the significant upward revisions to the §2B1.1 loss table including in 2001 and then again in 2003.[3]

Yet another salient failing of the §2B1.1 loss table as applied to Defendant Artashes Darbinyan is its failure to take account of his mental state.  He was literally out of control due to chronic substance abuse.

---

[3]  On the topic of "abstract arithmetic," the prosecution may take issue with the defendant's request for a sentence significantly below the Guidelines that have been calculated in the PSR.  However, this flawed line of reasoning has been rejected by no less a judicial body than the Supreme Court which held in its Gall ruling:

> We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the guidelines range.  We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.

See Gall v. United States, 552 U.S. 38 (2007).

One final observation on the advisory guidelines as they have been computed for Mr. Darbinyan by Probation.  In their cover letter at page 5, in a sub-section entitled "Seriousness of the Offense," the Probation Office notes that "The loss in this case results in a base offense level of 29 under U.S.S.G. §2S1.1, which places it *at the mid-range in the spectrum of seriousness*" (emphasis added).  Yet far from being "mid-range" the sentence recommended by the Probation Office -- 188 months -- is stratospheric and completely out of synch with the severity of the offense or the §3553(a) guidance concerning the appropriate length of sentences. In this instance, a term of incarceration anywhere in the vicinity of 10 or 15 years would indeed be "unhinged from the now-established first principle of sentencing" and "not cabined by common sense."

E .   *A Total Offense Level Of 28 At Criminal History Category II Results In An Advisory Guidelines Range Of 87 To 108 Months*

Mr. Darbinyan, through counsel, respectfully requests that the Court find that both the two-level "sophisticated laundering" specific offense characteristic [U.S.S.G. §2S1.1(b)(3)] and the four-level aggravated role adjustment [U.S.S.G. §3B1.1(a)] are unwarranted and should not be applied.  This would result in a total offense level of 28, which at Criminal History Category II, equates to an advisory guideline range of 87 to 108 months.

# IV.

## THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT SUPPORT THE REQUESTED SENTENCE OF SIXTY MONTHS IMPRISONMENT

In Gall v. United States, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3533(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the

Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented."  Id. at 49-50.

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'"  Pepper v. United States, 562 U.S. 476, 486-487 (2011) quoting Koon v. United States, 518 U.S. 81, 113 (1996).  The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.' " Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949).  The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

 In keeping with the above and in the spirit of 18 U.S.C §3661, the following social history information concerning Mr. Darbinyan is presented.

A.     *Defendant's Family Background*

Artashes (Art) Darbinyan was born on November 2, 1979 in Yerevan, Armenia.  He is the older of two children of Araik Darbinyan, who died in 2004, and Veronika Darbinyan, age 76.  Veronika is retired and lives in Glendale.  She and her husband Araik were both professional economists and met while working together at a government economic institute in Armenia.  Veronika also managed a theater company in Yerevan.  Art's father had a long and illustrious career in Armenia.  In addition to founding the government's Management and Economic Reforms Institute, Araik Darbinyan was also a consultant to Armenia's Finance Ministry.

Art's half-sister, Izabella Shakhmuradova, is his mother's daughter from her first marriage.  Izabella, age 53, lives in Glendale and works as a textile designer. Art's younger sister Sofya, 35, also lives in Glendale.  Sofya is a business manager who currently works on development of children's art and science workshops.

B.   *Childhood and Adolescence*

Art has fond memories of his early childhood.  His family was tight-knit and the only difficulty he recalls is missing his father when he was away on business trips.  His sister Izabella was 16 when Art was born and she became one of his primary caretakers.  Art's parents were both educated professionals and they encouraged Art and his siblings to work hard in school.  In her letter to the Court (attached at Exhibit B) Art's mother Veronika relates:

> My life's purpose and premise was to give to all my 3 children good education and to raise them to be kind, considerate, honest, compassionate, hardworking, and helpful for their community.  Those were ideologies that my husband and I shared.  Artashes' father was a truly inspiring economist specialized in math methods in economy, with doctorate degree, director of a large economy institute of Armenia, and eventually an advisor to an Armenian Minister of Economy.  Growing up, Artashes was a very smart and intelligent boy who loved reading adventurous stories and always been involved in projects and sports.  I have never had any problems with his studies in school.  Besides school he used to attend afterschool activities like judo, tennis and ceramics.

Veronika's friend Anahit Afrikyan is a biochemist who worked for decades at the Medical University of Armenia.  She writes:

> Artashes was a bright and active kid since birth, generally concerned about the same issues kids his age thought about, and usually devoting a little extra attention to things that meant something special for him.  For example, I remember he was taking art/sculpting class and he made a huge fish with a hollow stomach.  During the class exhibit, some people offered a big sum of money to buy his sculpture and even his teacher was actively convincing him to sell but Artashes didn't sell no matter what.  Later he explained that the sculpture was too dear for him to sell.  I also always felt that he had a great sense of humor.

Art began playing tennis when he was ten.  He was a serious player until age 19 and played twice in tournaments in Moscow with participants from all over the former Soviet Union.  When school was in session, Art played tennis two hours a day and during the months when school was out he regularly played eight hours each day.  He continued playing recreationally after he moved to California.  Art's friend Samvel Hovhannisyan is a computer marketing specialist who grew up with Art in Armenia.  Samvel recalls in his letter:

> I've known Artashes for 20 years.  When we were teenagers around 15 years of age, we used to play tennis at the same tennis academy.  Artashes was a very talented tennis player.  I find him a very intelligent, hardworking, honest and friendly individual.  He was always very community oriented at the tennis school helping others when needed.  I remember a particular case once during tennis tournaments when one of our team members

18

> injured his leg during the game and there was an issue
> with transporting him to the hospital.  Artashes filled in
> to help out our teammate who was in excruciating pain.
> He was also exceptionally hardworking for that age.
> Once our tennis academy held a summer camping trip
> that lasted a week.  During the whole trip he was the first
> person up every morning at 5 a.m. fishing at the lake and
> then sharing his caught fish with the whole team.  He has
> been a true friend to me since our teenage years, honest
> and direct at all times and also realistic.

Art's life changed drastically when he was in sixth grade and his family moved to Moscow for one year.  His father was completing graduate work in Moscow and the family joined him there.  Art disliked life in Moscow immediately.  Both he and his younger sister were bullied at school.  In an interview, Art remarked:

> I got picked on because of my dark skin and my sister got
> picked on for being a newcomer.  I protected her as best I
> could but I couldn't be there every minute.  One good
> thing that came of it was I learned how to avoid fights.
> When people did things like throw my book bag out of
> the window they were trying to get me to fight.  But I
> learned how to use my brain to resolve things.

Art and his family moved back to Yerevan when he was in seventh grade.  The family lived in a two-bedroom house.  Art's parents slept in one bedroom and his sisters in the other.  Art had a makeshift room where he slept and studied.  While he was glad to be out of Moscow, life was changing quickly in Armenia when Art's family returned.  As he describes it, "things were falling apart."

19

Armenia is the second most densely populated of the former Soviet republics.  Its economy has suffered greatly since the break-up of the Soviet Union and it is currently one of the world's poorest countries, with over 30 per cent of the population living below the poverty line.  Beginning in the late 1980s, there was a steady increase in political conflict in the Soviet Union that eventually resulted in the break-up of the country and a subsequent breakdown in local authority.  By 1988 there were large and nearly constant demonstrations in Art's hometown of Yerevan, Armenia's capital city.  The political situation was complicated by violent ethnic conflict between Armenia and neighboring Azerbaijan which was later further exacerbated by neighboring Turkey closing its border with Armenia in support of Azerbaijan.  A state of emergency was declared in November 1988, by which time thousands of ethnic Armenians were fleeing Azerbaijan and returning to Armenia.  The conflict ultimately displaced more than one million people.

These ethnic and political tensions were exacerbated in December 1988, when two large earthquakes occurred in quick succession, centered about 60 miles north of Yerevan.  The quakes caused serious damage throughout Armenia.  An estimated 60,000 people died and nearly half a million buildings were destroyed.  Despite lingering Cold War tensions, Soviet leader Mikhail Gorbachev formally asked the United States for humanitarian help within a few days of the earthquakes, the first such request since World War II.

For the remainder of his years in Armenia, Art and his family would live through the consequences of these dramatic events.  For several years, supplies of running water and electricity were intermittent or non-existent.  Bread was rationed and the lines were extremely long.  In his interview Art recalled:

> People made do as best they could.  For several years we
> had electricity for one hour a day.  There was no
> transportation, no water.  That's where I first learned

20

> about being an entrepreneur.  I started trading things like
> used clothing for food.  I also learned how to repair
> things, especially how to keep electricity to the house
> running.  I think that helped when I started learning
> computers when I came here.

The areas hit hardest by the earthquake are still recovering today, but Yerevan was somewhat normalized by the late 1990s.  Art was able to finish high school and attend two years of college studying economics.  However, his life in this period was complicated by more than Armenian politics and its faltering economics.

Art's older sister Izabella, who had helped raise him, left for the United States not long after the family's return from Moscow.  Then the political environment had a direct impact on Art's family when his father, who was connected with the finance ministry, began receiving threats when he refused to take bribes and participate in the rampant corruption that prevailed at the time.  The possibility of violence was real.  In his interview, Art recalled:

> It was a dangerous time to be in politics.  Within a few
> years, there was an attack on Parliament while it was in
> session.  Several people were killed.

In this atmosphere, Art's parents were unable to hold their relationship together and they divorced when Art was 15.  His father then fled to Moscow. When his father left Art was living in Potsdam, Germany, where he was enrolled in a summer course.  By the time he returned to Yerevan, his mother and younger sister had moved to California to join his older sister in Glendale.  In sum, Art returned to an empty house.  This is when his longstanding substance abuse problems began:

I stayed a summer or two with my father in Moscow, but most of the year I was alone in Yerevan.  I wanted to stay in Yerevan because I didn't like Moscow.  I still had bad memories from when I lived there when I was younger.

In Yerevan I was still living in the house my family had shared but I had it all to myself.  This is where I started drinking, often to excess.  It lasted a few years but when I started university my father would check up on me with friends he knew there.  They would tell him I was having trouble in school.  After that the family decided I should come to California.

Tigran Aslanyan and Art's father were good friends.  Mr. Aslanyan relates in his letter:

I think Artashes' misfortunes began in 95 when my friend Ara Darbinyan deeply disappointed by the governmental corruptions moved to live and work in Moscow.  He accepted a position in a Moscow University, as a professor of high mathematics, but his sudden move really startled Artashes since his sisters and mother was at the time visiting in the USA.  I would occasionally visit Artashes in Armenia, to check up on him, and noticed that he had alcoholic empty bottles sometimes at home, which was very uncommon.  When we talked about it, he expressed his disagreement with his father's decision to move to Moscow.

Art's mother Veronika Darbinyan observes in her letter:

In 1993 my oldest daughter… got married and moved to US to her husband.  In 97 my youngest daughter… and I moved to US and Artashes stayed behind in Armenia with his father, at the time he was in his teens.  Not long after I learned that my husband, left our son behind in Armenia and moved to Moscow with a new job opportunity and started a new family.  That's when I also found out from Artashes' friends that my son was going through a lot of stress being all by himself and that he started to abuse alcohol.  Artashes loved his father very much and the idea of his father leaving, requesting a divorce, and especially starting a new family gave him emotional turmoil.  I flew back to Armenia but my husband never returned.  Soon my children and I all got reunited and living in the US.

C.    *Life in the United States*

Art moved to Glendale, California in 1998.  Initially he moved into his older sister's one-bedroom apartment, which he shared with his mother, his two sisters, and his brother-in-law.  After a year the family moved into a two-bedroom apartment in the same complex.  Soon afterward, his sister divorced and everyone moved into another two-bedroom apartment nearby.  This arrangement lasted until Art enrolled at UC Irvine in 2003.

In the summer of 2003 Art married Eyva Darbinyan.  The marriage was troubled from the beginning and the couple separated in 2005 and divorced in 2006. They had no children.

Art went to work soon after he arrived in Glendale, delivering pizzas and parking cars for a valet service, as well as delivering and setting up jumpers for

children's parties on weekends.  In his spare time, he began spending countless hours working on his older sister's computer.  He also took classes at a number of community colleges and earned an Associate's degree from Santa Monica College in 2002.  He graduated from U.C. Irvine in 2007 with a degree in economics.

Art's employment history since he left college has been marked by severe contrasts.  While he has shown a talent for conceptualizing and overseeing projects, especially in software development, his inability to focus, due almost exclusively to his drug and alcohol abuse, has meant that his employment history has been spotty since he completed college.  Art has a penchant for embarking on grand projects, managing money badly, and then acting out of desperation to either get back on his feet or fall further into the downward cycle of substance abuse. This is the pattern that led to his criminal conduct in the instant matter.

Before starting his own businesses, Art worked as a data entry clerk at Shason Inc., a textile design firm in Los Angeles from 2000 to 2002.  From 2004 to 2007, he worked at Velvet Hammer Music and Management Group, a record label and artist development and management company located in West Hollywood.  Art earned $3,000 per month at Velvet Hammer doing software development and web design.  He helped Velvet Hammer design and develop Streetwise Concepts and Culture, a fan volunteer internet network for grassroots promotion.  Art then worked in two graphic design and software development positions, first at CDR Graphics in Los Angeles from 2003 to 2006, and then at LRN Corporation in Glendale from 2006 to 2007.  Since 2008, Art has been in business for himself, primarily in development and sales of credit repair software products, with intermittent but unsustained success.  In an interview he related:

> I learned software development on the job and at home but I was introduced to marketing when I was studying economics at UC Irvine.  I studied that on my own too

24

after college.  I don't know what I was thinking when I got involved in a mail fraud scheme.  I'm good at software and if I had only concentrated on that I could have made a go of it.  Instead I am going to lose years of my life paying for the most senseless thing I've ever done.

D.   *History of Substance Abuse*

It is no coincidence that Art's drug and alcohol use was at its height when he engaged in the activity that brings him before the Court.  Given his talent and abiding interest in software design and development, it is hard to imagine that he would have become involved in illegal activity were it not for his serious substance abuse problem. Art began drinking when he was a teenager living alone in Yerevan. When he moved to California he had no drug or alcohol problems for a few years because he spent most of his time working and attending school.  When he graduated from UC Irvine he began using drugs and alcohol to excess and his most serious drug use began in 2013.

Art's history of substance abuse is well documented.  In addition to his current treatment, which includes intensive outpatient treatment at Aurora Las Encinas Hospital, Art checked into Aurora Las Encinas twice previously for drug and alcohol detoxification in 2010 and 2014.  A 2014 evaluation from Las Encinas (Exhibit C) notes:

The patient admitted to abusing a variety of drugs including cocaine, Xanax, OxyContin, Norco, alcohol, and at times morphine.  The patient reports that he wants to get his normal life back and he is tired of doing all these kind of drugs.  He claims that he was sober for four

years but relapsed last month.  He was here four years

ago for benzodiazepine dependence.

The patient reports that he has been using about 8 mg of

Xanax per day and about three tablets of OxyContin 5

mg per day.  He is also drinking two bottles of wine per

day plus vodka sometimes and whisky or beer, usually

three to four shots.  He also has been snorting cocaine

and reports that he was using about one-eighth of a bowl

which is probably 0.125 g.  The patient was snorting

crushed Norco tablets usually two tablets per day.

Codeine, he tried that; today, he used up to 40 mg.

Art knows that his reckless use of drugs and alcohol ruined several years of

his life, compromised his health, and was the primary cause of the bad decisions

that bring him before the bar.  For an extended period – which overlaps with his

offense conduct -- Art estimates he spent hundreds of dollars per week on drugs

and alcohol.  He has a perforated septum caused by cocaine abuse and he is

ashamed that after spending so many years of his youth dedicated to athletics and

physical fitness, he has not been in good physical shape in years.

In her letter to the Court, Art's mother Veronika writes:

However after his own misfortunes in marriage that

ended in a divorce and the news that shocked him the

most his father's death, broke him down again.  At work

he was working very hard, but at the same time as a

remedy to his emotional turmoil he thought he could find

escape in alcohol and drugs.  When I found out about it

and talked to him he admitted that he needed help.  My

26

daughters and I sought to find professional help but
apparently weren't successful.  It was a very long,
torturous journey, seeing my son going through
withdrawals, horrific pain, addiction, efforts, and battle.
Later I also learned that he had broken the law and that
was devastating.

Art's brother-in-law Samvel Hovhannisyan observes in his letter:

Since the mistakes he has made have come to light, I
have seen him willingly change for the better.  He even
started attending church with our family on Sundays…
Life presents obstacles at various times and certainly
Artashes has struggled with the demons of addiction.
What is most important is that a person, who has made
mistakes, admits the wrongdoing and willingly changes
for the better.  I have seen that process in Artashes.  He is
very remorseful and does everything possible to improve.
He has been working lately very hard on a couple of
ideas, doing fair and ethical business, working from
morning till night.

Ofer Shitrit is CEO and President of Trail Lines, Inc., a trucking company in
Santa Fe Springs.  Ofer has known Art for more than ten years.  He writes:

He expresses a lot of regrets and sadness in regards to his
past and current situation.  However, I know Art and I
know that he is very upset and sad with himself, knowing
that much of his problems now are because of a long time
drug addiction.  He and I believe that now that he has

27

been clean from drug use and continues rehabilitation he
is committed to start a clean new honest path in life.
The new path includes staying clean, paying off his
restitution, practicing only honest, legitimate business
practice and always being who I know him to be – a good
sensitive person who has always helped people including
family and friends.

## V.

## PSYCHOLOGICAL FACTORS

To gain further insight into Art Darbinyan's personality and the motives
underlying his illegal conduct, undersigned counsel referred him for assessment to
Saul J. Faerstein, M.D., a forensic psychiatrist with a long familiarity with Federal
criminal jurisprudence and the Central District.  Dr. Faerstein conducted a lengthy
interview of the defendant and authored a 7 page report dated August 2, 2017
(appended hereto at Exhibit A).  In the "Opinions and Recommendations" section
of his evaluation, Dr. Faerstein finds:

Artashes Darbinyan is a 37 year old single man who was
raised in a middle class family with prosocial values. His
father's resistance to the corruption in his country was a
very positive model that Artashes has continued to
admire. I believe that Artashes feels he has incorporated
his father's moral values and moral backbone even
though his behavior doesn't currently reflect that.
Growing up in Armenia at the time of the collapse of the
Soviet Union, and at the time of a major destructive
earthquake, was a strong negative force because of the
chaos this caused in his country and in his family. This

was simultaneous with a marital rupture and divorce and
the seeming abandonment by his father just when he
needed the guidance and support his father represented.
This undoubtedly led to a form of mental instability and
lack of confidence in his capacities to succeed. Moving
to the United States added new challenges and
uncertainties. His academic and intellectual successes
never erased his insecurities but they did provide him
with tools to succeed if he could overcome his own
anxieties and fears. Unfortunately, Artashes found that
alcohol and substance abuse was the most available and
easiest balm for his emotional pain. He relied on alcohol
as self-treatment when he had school problems in college.
When he experienced frustration in business, he relied on
drugs and alcohol to self-treat. When he wanted to
reward himself for business success, he celebrated with
alcohol and drugs because it made him feel good. He
could not find a legal healthy means of rewarding himself
emotionally for doing well. (Faerstein Report, pages 5-6.)

With respect to Mr. Darbinyan's chemical dependency problems, his need
for intensive ongoing treatment, and his prognosis for the future, Dr. Faerstein
observes:

Artashes clearly needs to find a well-regarded and
successful drug treatment program if he is to reverse the
destructive pattern of his life… Artashes Darbinyan does
have a Substance Abuse Disorder and Alcohol Abuse
Disorder which have gone untreated until now. Beneath

the heavy mantle of this disorder there can be found an
intelligent, creative, and prosocial individual with unique
skills and potential. He has demonstrated that he can
develop and produce tools and new businesses which,
when done in a legal framework, can support him and
help others. I believe his basic prosocial outlook was
overridden by his substance abuse disorder, a mental
disorder which is treatable. (Faerstein Report, pages 6-7.)

## VI.

## LETTERS FROM CONCERNED PARTIES

A number of letters of support have been submitted on Art's behalf from
family and friends.  These letters attest to his sincere remorse, his concern for his
family, and his penchant for helping others.  All of the letters are appended
(Exhibit B) and a few are excerpted here.

Art's sister Sofya Darbinyan writes:

Artashes' honesty and strong work ethic has always
impressed me since childhood be it on the projects he
worked on in his wood working class at age 8 or creating
websites and developing programming for big computer
firms in later stages of his life.  He has always been
committed to helping and looking after our family and
community even back in Armenia.  When my son, his
nephew, was battling with cancer, he was there holding
his hand during excruciating chemotherapy sessions.  I
am a mother of three and Artashes is one big part of my
children's life.  Artashes spends time with them on a

weekly basis.  He is their favorite uncle and they love
him to pieces.

After admitting his wrongdoings, he has come to a good
path of self-improvement and ethical living.  He is
committed to living an honest life and being a useful and
helpful part of the community.  I have seen him join
programs of improvement and definitely see the changes.

Armen Ktshozyan, brother-in-law, states:

For me, personally, Artashes has been someone I can
count and depend on.  When we purchased our apartment,
Artashes was involved in the remodeling process on a
daily basis for up to 8 hours a day.  Further, he is my 9-
year-old daughter, Maryana's, godfather and is a big part
of her life.  Artashes babysits Maryana, picks her up from
school, tutors her in math, and spends a lot of time with
her…

Aside from being a positive influence in Maryana's life,
Artashes is heavily involved in the lives of the other
members of his family.  For example, he was a constant
presence and an invaluable help when his younger
sister's son, Neo, was diagnosed with cancer.  Artashes
would spend hours at the hospital keeping Neo company
and doing his best to cheer him up in between
emotionally and physically draining chemotherapy
sessions.  There is no doubt that Artashes's support and

involvement were a great help and contributed to Neo's

eventual recovery…


Artashes is not perfect and he has shared his struggles

and problems with me, as well as admitted his

wrongdoing.  I am now seeing a side of Artashes that I

have not seen since before his troubles with alcohol and

drugs took control of his life.  For that, I am very grateful.

Both Artashes and those that care about him know and

understand that what he did was wrong, but we also

know that he is truly remorseful about what has happened

and is legitimately attempting to turn his life around.

Artashes is intelligent, a good person, and by no means a

danger to society.

Physician Naira Yermoyan is a friend of Art's older sister and has known

him since he was a child.  She writes:

Artashes was not only helpful for his family but also for

my family as well.  When my mom lost her job he

offered her to stay with his family in their house, helping

her by giving her shelter and food and emotional support.

After his father's death, he has become the man of the

house.  The mistakes he has made that bring him before

the Court have impressed upon him that he needs to

separate himself from any and all negative influences.  I

have seen vast changes in him, he is working hard to

improve himself and learn from his mistakes.

# VII.

## A REVIEW OF THE §3553(a) FACTORS

## SUPPORTS THE REQUESTED SENTENCE

A.      *The Need for Just Punishment*

Given the collateral consequences of a felony conviction for someone like Art Darbinyan, whose reputation has already been severely damaged and whose life has been turned upside down for the foreseeable future, the requested non-guideline sentence of five years would be amply punitive.  Severe collateral consequences include the possibility of deportation to an impoverished and politically divided country where Art has no remaining ties and where he has not lived in two decades.  Given the manifold punishments that have already begun, and will continue in waves into the future, adequate retribution can be imparted with a sentence of five years imprisonment.

B.      *Deterrence*

There are two types of deterrence, specific (or individual), and general (or societal).  With respect to individual deterrence, it is highly unlikely that Art Darbinyan will commit this or any type of Federal crime again.   Art is a recovering alcoholic and drug addict who realizes full well that his history of substance abuse is the primary cause of his current dilemma.  He is committed to maintaining his sobriety and dedicating himself to applying his considerable talent to honorable pursuits.

In terms of general deterrence, no reasonable person could conclude that a sentence of 5 years Federal imprisonment, coupled with the likelihood of deportation to Armenia and lifetime separation from loved ones and friends, constitutes "getting off lightly."

C.      *Societal Protection*

There are unquestionably cases where incapacitation is required to protect the public from further crimes on the part of predatory defendants, but this is not one of them.  Prior to this matter, Art had only minor contacts with the criminal justice system.  He has no history of violence or use of weapons.  Not only does he not pose a danger to others but, conversely, as documented by the letters submitted on his behalf, the acts of compassion and kindness to which he has been committed throughout his life have done much to help others.

D.      *Rehabilitation*

While the educational and developmental programs that the BOP has to offer [i.e., obtain "correctional and vocational treatment" §3553(a)(2)(D)] are surely beneficial to some defendants, Art has already been working diligently towards personal rehabilitation.  He has matured noticeably since his arrest and now spends the bulk of his time in the company of his family.  He is participating in a respected intensive outpatient program and he is growing out of the selfish habits that led to his conviction.  Art is also committed to making amends for his lost years, especially with regard to his family.   The rehabilitation process for this defendant can best be accomplished in the community rather than a protracted term in penal institutions.

E.      *Restitution*

Obviously, Art will be paying restitution for many years to come.  But it is significant that Art has already paid $65,000 in restitution before sentencing, while most defendants pay nothing until after their sentence is imposed.  The fact that the funds used to pay his debt to society will be drawn from his own efforts and labors, as well as family contributions, will serve as a constant reminder to him of the impact of his actions on those closest to him and provide a further guarantee that he will not recidivate.

# VIII.

## THE REQUESTED BELOW-GUIDELINE SENTENCE
## IS IN CONFORMANCE WITH THE CURRENT STATE OF THE LAW

Under the principles set forth in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are purely advisory.  The guidelines are now just one among a number of factors that the sentencing courts are meant to assess in imposing a sentencing that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).  These purposes consist of retribution, deterrence, incapacitation and rehabilitation.  Neither §3553(a) itself nor <u>Booker</u> suggests that any of these circumstances is paramount; however, all of these factors are controlled or overridden by §3553(a)'s mandate to impose a sentence "not greater than necessary" to comply with the purposes of sentencing.

Numerous appellate decisions have clarified the role and approach of the sentencing court post-<u>Booker</u>.  First, the Ninth Circuit has found that "Booker empowered district courts, not appellate courts.... [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing." <u>United States v. Whitehead</u>, 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted).

Second, the Sixth Circuit has stated: "Many times we have emphasized that a district court's mandate is to impose a sentence sufficient, but not greater than necessary to comply with the purpose set forth in §3553(a)(2)." <u>United States v. Yopp</u>, 453 F3d 770, 773 (6th Cir. 2006).  The Sixth Circuit further has explained the role of the sentencing court as follows: "[A] district court's job is not to impose a 'reasonable' sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).  Reasonableness is the appellate standard of review in judging whether a district court has accomplished its task." <u>United States v. Foreman</u>, 436 F.3d 638,

35

644 n.1 (6th Cir. 2006).  Furthermore, the Ninth Circuit has stated, concerning the conclusions of the district court relating to sentencing, that the proper standard is abuse of discretion, and it will not "second guess" the court's conclusions so long as they are reasonable.  United States v. Menyweather, 447 F.3d 625, 633 (9th Cir. 2006).

Finally, the Seventh Circuit has stated that post Rita v. United States, 551 U.S. 338 (2007) "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a guideline sentence." United States. v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).

## IX.

## CONCLUSION

On the grounds set forth in this memorandum and its attachments, Defendant Artashes Darbinyan, through counsel, respectfully urges the Court to impose a sentence of five years imprisonment.   A sentence along these lines would be "sufficient but not greater than necessary" to effectuate justice, and would be in compliance with the sentencing factors set forth at 18 U.S.C. §3553(a).

Dated: August 7, 2017                    Respectfully submitted:


By      _____/s/_____
LARA YERETSIAN
Attorney for Defendant
ARTASHES DARBINYAN