SANDRA MOSER
Acting Chief, Fraud Section
Criminal Division
WILLIAM E. JOHNSTON (Cal. Bar No. 287707)
ALISON L. ANDERSON (Cal. Bar No. 275334)
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
    1400 New York Ave NW
    Washington, District of Columbia 20530
    Telephone:  (202) 514-0687
    Facsimile:  (202) 514-0152
    E-mail:       William.Johnston4@usdoj.gov
                     Alison.Anderson@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-558-SVW-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT ARTASHES DARBINYAN |
| v. | |
| ARTASHES DARBINYAN, | Hearing Date: August 21, 2017 |
| Defendant. | Hearing Time: 11:00 a.m.<br>Location:    Courtroom of the<br>               Hon. Stephen V.<br>               Wilson |

        Plaintiff United States of America, by and through its counsel
of record, Trial Attorneys William E. Johnston and Alison L.
Anderson, hereby files its Sentencing Position Regarding Defendant
Artashes Darbinyan.

        This position is based upon the attached memorandum of points
and authorities, the files and records in this case, and such further
evidence and argument as the Court may permit.

Dated: August 08, 2017                Respectfully submitted,

                                      SANDRA MOSER
                                      Acting Chief, Fraud Section
                                      Criminal Division
                                      U.S Department of Justice


                                      _____/s/_____
                                      WILLIAM E. JOHNSTON
                                      ALISON L. ANDERSON
                                      Trial Attorneys

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.   INTRODUCTION**

3       The defendant Artashes Darbinyan once again faces sentencing for

4 perpetrating a sophisticated and premeditated mass mailing scam.  In

5 2010, the defendant was charged in California state court with

6 running a mass mailing scheme under the name of Homeowner Property

7 Tax Review Board.  That scam targeted property owners in the Los

8 Angeles area with fraudulent offers of tax assessment services.  A

9 plea bargain to a misdemeanor and a sentence of probation did nothing

10 to deter the defendant.

11       By 2013, the defendant had started another mass mailing scam,

12 this one even larger in scale and scope.  Operating under the names

13 of Trademark Compliance Center and Trademark Compliance Office, it

14 targeted hundreds of thousands of small businesses around the country

15 that had applied for trademark protection.  Having learned how his

16 previous scam had been uncovered, the defendant used a string of

17 false identities, mail forwarding centers, bogus bank accounts, and a

18 number of co-conspirators to ensure he could pull it off and launder

19 the illicit proceeds without getting caught.  Only the diligence and

20 persistence of law enforcement ensured that the defendant was

21 identified and arrested in September 2015 and now faces sentencing by

22 this Court.

23       The PSR's calculation of the applicable offense level is 34 and,

24 with a criminal history category of III, the Sentencing Guidelines

25 range is 188-235 months.  (PSR, at 22.)  Considering the sentencing

26 factors laid out in 18 U.S.C. § 3553(a) and the aggravating and

27 mitigating factors in this case, the government recommends the Court

28

1    impose a sentence at the bottom of the applicable guidelines range,
2    188 months.

3    **II.   PROCEDURAL BACKGROUND**

4         On September 18, 2015, the defendant was arrested on a complaint
5    charging him with mail fraud, in violation of 18 U.S.C. § 1341, and
6    aggravated identity theft, in violation of 18 U.S.C. § 1028A.  On
7    October 9, 2015, the defendant was indicted on similar charges, and
8    subsequently charged in superseding indictments filed on January 14,
9    2016 and July 14, 2016, which added money laundering and bank fraud
10   charges to the mail fraud and aggravated identity charges.

11        On December 12, 2016, the defendant pleaded guilty to one
12   count of mail fraud, in violation of 18 U.S.C. § 1341, and one count
13   of conspiracy to launder monetary instruments, in violation of 18
14   U.S.C. § 1956(h).

15   **III. STATEMENT OF THE FACTS**

16        **A.   Fraudulent Scheme**

17        For over two years, the defendant ran a sophisticated mass
18   mailing and money laundering scheme under the names of Trademark
19   Compliance Center and Trademark Compliance Office.  The defendant
20   used a commercial mailing company to send fraudulent solicitations to
21   hundreds of thousands of trademark applicants throughout the country.
22   The solicitations purported to offer a registration and monitoring
23   service whereby, in exchange for $385, an applicant's trademark would
24   be registered with the Intellectual Property Rights Recordation
25   service of U.S. Customs & Border Protection (CBP), which would screen
26   imports for possibly infringing trademarks.  The solicitations listed
27   return addresses in Arlington or Alexandria, Virginia to make
28   applicants believe that the solicitations were affiliated with the

2

real U.S. Patent & Trademark Office, which is located in Alexandria, Virginia.  Trademark Compliance Center and Trademark Compliance Office even had websites that touted the benefits of the service and a phone number for customers to call.

It was all a sham.  The return addresses on the solicitations in fact belonged to virtual office centers, which were under instructions to collect victims' checks and forward them to addresses in the Los Angeles area.  Those Los Angeles addresses, in turn, belonged to other virtual office centers, from where the defendant and his co-defendant Orbel Hakobyan picked up the packages containing the victims' checks.  Those checks were then deposited into Wells Fargo bank accounts, the funds transferred to additional bank accounts, and finally withdrawn in the form of cash or cashier's checks to purchase gold – at which point the funds became untraceable.

The entire scheme was fraudulent from inception.  Not a single email account, phone number, mail forwarding account, website, or bank account was opened in the defendant's real name.  Rather the defendant utilized a host of stolen identities, complete with names, date of births, and social security numbers, belonging to real individuals – who had temporarily come to the United States from Eastern Europe and returned to their home countries – to register every type of account used in the scam.  As scrutiny of his scam grew, the defendant repeatedly switched phone numbers and changed the name of the "business" from Trademark Compliance Center to Trademark Compliance Office and swapped out the stolen identity used to incorporate the company.  Such concealment makes abundantly clear that the defendant never intended to honor the offers he was making.

And, indeed, not a single one of the 4446 victims who paid for the defendant's supposed service ever had their trademark registered with CBP.

**B.   Money Laundering Operation**

To ensure the scam's success, the defendant had to run a sophisticated money laundering operation:  the money had to become untraceable as quickly as possible and the defendant's control had to remain invisible.  In exchange for a portion of the fraudulent proceeds, co-defendant Albert Yagubyan, the branch manager of a Wells Fargo in Glendale, California, allowed the defendant to open bogus bank accounts and make fraudulent withdrawals at his branch.  Shortly after depositing the victim's checks, co-defendant Orbel Hakobyan, by pretending to be the signer on the account, would make many of these withdrawals through cashier's checks that he would then use to purchase gold.  Co-defendant Yagubyan ensured that there were willing tellers at the bank branch who would allow the defendant and Hakobyan to withdraw funds from the bogus accounts, which were not in their real names.  The defendant created additional shell companies and bank accounts to introduce additional layers that would reduce the likelihood of detection.  When Wells Fargo closed the bogus accounts, the defendant turned to check cashing businesses to continue laundering the illegal proceeds.

In the course of the conspiracy, the defendant and his co-conspirators grossed approximately $1,661,569.73 from 4446 victims, and laundered the proceeds by turning victims' checks into untraceable cash and gold.

**IV.   THE PRESENTENCE REPORT AND THE GOVERNMENT'S OFFENSE LEVEL CALCULATION**

The PSR has calculated an offense level of 34 for the defendant and the government agrees with the USPO's calculation of the applicable guidelines.  With a criminal history category of III, which the government has no reason to believe is inaccurate, the defendant's guidelines range is 188 to 235 months.

**A.   Sentencing Guidelines Calculation**

The defendant pleaded guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341, and one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h).  In his plea agreement, the defendant agreed to the following guidelines:

**Mail Fraud**

| | |
|---|---|
| Fraud Base Offense Level (§ 2B1.1(a)) | 7 |
| Loss Greater Than $1,500,000 (§ 2B1.1(b)(1)(I)) | +16 |
| Committed through Mass Marketing (§ 2B1.1(b)(2)(A)(ii)) | +2 |
| Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Use of Authentication Feature (§ 2B1.1(b)(11)(A)(ii)) | +2 |
| Subtotal: | 29 |

**Money Laundering**

| | |
|---|---|
| Money Laundering Base Offense Level (§ 2S1.1(a)(1)) | 29[1] |
| Convicted Under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| **Adjusted Offense Level:** | **31** |

---

[1] Pursuant to § 2S1.1(a)(1), when the defendant is guilty of the underlying offense that created the illicit proceeds, the offense level from that guideline is the starting point.  Because the defendant is guilty of mail fraud and laundering the proceeds of that fraud, the fraud offense level becomes the base offense level for money laundering.  Under the grouping rules, however, the adjusted offense level is merely the guideline that produces the highest offense level, in this instance, the money laundering guideline.

5

The defendant cannot contest any of the above sentencing guidelines without violating his plea agreement. However, in the plea agreement, the parties reserved the right to seek additional enhancements or departures as deemed appropriate.

**B.   Additional Enhancements Applied by the PSR**

In the PSR, probation recommends, and the government agrees with, two additional enhancements: a two-level enhancement for sophisticated money laundering pursuant to U.S.S.G. § 2S1.1(b)(3); and a four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a). These enhancements result in an adjusted offense level of 37. Following a three-level decrease for acceptance of responsibility, the total offense level is 34, as detailed below:

**Total Applicable Guidelines**

| | |
|---|---|
| Money Laundering Base Offense Level (§ 2S1.1(a)(1)) | 29 |
| Convicted Under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Sophisticated money laundering (§ 2S1.1(b)(3)) | +2 |
| Organizer and Leader Enhancement (§ 3B1.1(a)) | +4 |
| Acceptance of Responsibility  (§ 3B1.1(a)-(b) | -3 |
| Total Offense Level: | **34** |

**C.   Sophisticated Money Laundering Enhancement**

The money laundering scheme was highly sophisticated and thus warrants an enhancement under § 2S1.1(b)(3). The defendant and his co-conspirators stole and used identities of real individuals, incorporated shell companies with the use of these stolen identities, set up both personal accounts in these stolen identities and business accounts for the shell companies, deposited victims' checks into the business accounts, quickly transferred the money to multiple places (often to the personal accounts), and withdrew much of the money in

6

1  the form of cashier's checks payable to a gold distributor.  Indeed,

2  the money laundering scheme involved three of the four non-exhaustive

3  factors set out in the commentary to U.S.S.G. § 2S1.1(b)(3):

4  fictitious entities, shell corporations, and two or more levels of

5  transactions.

6       The guideline is particularly warranted when the sophisticated

7  nature of the scheme made it difficult for the government – as

8  described in detail in Postal Inspector Mark Trachtenberg's testimony

9  at the trial of co-defendant Albert Yagubyan – to identify the true

10 individuals who were depositing and withdrawing money from these

11 accounts.  The evidence gathered in the course of the investigation

12 showed that it was the defendant who was managing the stolen

13 identities, creating the shell companies, directing co-conspirator

14 Hakobyan to make the withdrawals to purchase gold, and communicating

15 with co-conspirator Yagubyan about how funds should be deposited and

16 transferred.

17      The defendant contends the sophisticated money laundering

18 enhancement should not apply because the only basis for the

19 enhancement is the conduct underlying the mail fraud scheme, which

20 contravenes the application note for the enhancement.  See

21 Application Note 5(b), U.S.S.G. § 2S1.1.  However, the conduct is

22 distinct and non-overlapping.  The mail fraud scheme was complete

23 when the defendant obtained the victims' checks by picking up

24 packages at the mail forwarding centers.  To get to that point, the

25 defendant crafted duplicitous mailers designed to appear official,

26 utilized multiple mail forwarding centers and business names, and

27 registered the accounts for those services in the stolen identities.

28 That conduct alone qualifies him for the separate sophisticated means

enhancement under the § 2B1.1(b)(10)(C) guideline.  Yet the defendant displayed additional sophisticated conduct, beyond the mail fraud conduct, to launder the victims' checks.  He opened multiple bogus bank accounts, created multiple shell companies, and utilized two or more levels of transactions to ensure the laundering itself would be undetectable and the laundered funds untraceable.  Accordingly, the enhancement applies.

**D.    The Defendant was in an Organizing and Leadership Role of the Offense**

The PSR found that defendant was the leader/organizer of the money laundering scheme – the most significant role – and that co-defendant Albert Yagubyan was the next level down, a manager or supervisor of the money laundering conspiracy.  These enhancements were correctly applied.

The leadership enhancement applies when there are five or more participants in the criminal activity, and the defendant was an organizer of the activity.   According to the Guidelines notes, factors to consider when deciding whether the enhancement applies are "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and the scope of the illegal activity, and the degree of control and authority exercised over others." Application Note 4, U.S.S.G. § 3B1.1.

The first requirement of five or more participants in the money laundering scheme has been satisfied.  Aside from the defendant, there are four other charged participants – Yagubyan,

Hakobyan, and the two cooperating bank tellers – plus at least two other uncharged participants who cashed victims' checks for the defendant at check cashers after the Wells Fargo bank accounts were closed.

The second requirement is satisfied by the overwhelming evidence of the defendant's lead role:  As the orchestrator of the mail fraud scheme, the defendant was the natural and obvious leader of the money laundering component as well.  The telephone record evidence showed that it was the defendant who was in constant communication with Albert Yagubyan regarding when deposits and withdrawals would be made, including when Yagubyan would get his payoffs, even when the underlying laundering transactions were conducted in the branch by Hakobyan and approved by the participating bank tellers; IP address information showed that it was the defendant managing the stolen identities to open the bogus bank accounts and shell companies; and the gold dealer stated that it was the defendant who first contacted her about purchasing gold and introduced her to (the person she later learned was) Hakobyan, who actually picked up the majority of the purchased gold.  See <u>United States v. Harper</u>, 33 F.3d 1143, 1151 (9th Cir. 1994) (holding that the enhancement applies where the defendant "exercised control over or organized others in committing this crime").  There was no one higher than the defendant controlling the schemes.

The defendant contends the enhancement does not apply because there is no direct evidence of the defendant directing the *money laundering* scheme, as opposed to the mail fraud scheme.  On the contrary, this Court saw at the trial of co-defendant Yagubyan the evidence showing the defendant's control of the transactions in and

out of the Wells Fargo bank accounts: the phone calls and in-person meetings between the defendant and Yagubyan that coincided with the transactions and the defendant's repeated attempts to obtain the scheme's funds once the accounts were frozen.  And the government, if needed, is prepared to prove, through agent testimony, how the records and statements of other witnesses show it was the defendant directing co-defendant Hakobyan throughout the money laundering scheme, not the other way around.  In short, the defendant was the one in charge of determining how much money was laundered, where it was laundered, who would launder it, and in what form.  Accordingly, the enhancement applies.

## V.   APPLICATION OF THE § 3553(a) FACTORS

The government recommends a sentence at the low end of the applicable guidelines range, 188 months' imprisonment.

### A.   Legal Standard

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in Section 3553(a).  See United States v. Cantrell, 433 F.3d 1296, 1279 (9th Cir. 2006).  "To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a).  This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence."  United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006).

**B.   Nature and Circumstances of the Offense**

The defendant's entire scam was one of the more sophisticated, elaborate, and premeditated operations ever encountered by government agents.  It was perfectly calibrated to deceive its victims.  The scam targeted trademark applicants immediately after they had applied for trademark protection with the USPTO, and thus were more likely to believe the fraudulent solicitation they were receiving was official mail connected with the registration process.  The solicitation itself offered a real service, i.e., registration with the CBP's IPR system, that applicants would have learned about online had they decided to do some independent research to check the legitimacy of the supposed offer.  The defendant created websites for Trademark Compliance Center and Trademark Compliance Office in case the applicants did just that.  The solicitation itself had return addresses that were near the USPTO, as many trademark applications would know that the USPTO was located in Alexandria, Virginia.  The solicitation looked professional and official:  it listed each applicant's identifying trademark information; it contained seemingly legitimate legal disclaimers on the back; and it was accompanied by a return mailer.

The measures the defendant took to avoid detection and identification were also extraordinary.  As an initial matter, the defendant used stolen identities to ensure nothing was in his or a co-conspirator's real name.  To guarantee that the victims' checks never came to a residence or place of business that could be linked to him, the defendant utilized two separate mail forwarding centers, and opened accounts there in the same stolen identities so he would have 24/7 access to the facilities to pick up the victims' checks.

11

The defendant communicated with the commercial mailer and the mail forwarding centers using email addresses also registered in the same stolen identities.  The defendant logged into those very email accounts using computers connected to prepaid wireless Internet modems, which left no uniquely identifying IP address on the email provider's server — thereby preventing law enforcement from tracing account usage to a particular address or user.  The defendant also utilized cash-paid "burner" phones to call anyone affiliated with the scheme, and changed these phones on a regular basis.  The bank records and bank surveillance records showed that deposits and withdrawals were almost all done without the defendant or Hakobyan being present at the teller windows, which the cooperating bank tellers later said was intentional.  And the money trail was deliberately designed to go cold, as all the proceeds were promptly turned to cash and gold.

Short of surveilling the virtual office centers 24/7 for weeks on end, the only way the government could identify the defendant was by promptly placing a geolocation warrant on one of the defendant's "burner" phones before he disposed of it.  The government was only able to learn of this number by convincing the virtual office centers to keep the defendant's accounts open and create excuses for the defendant to call in.  After successfully initiating the warrant, agents had to follow the geolocation pings provided by the cell phone company all over the Los Angeles area.  Over the course of a few days, those pings led them to the defendant driving a white Porsche, and ultimately his identification and arrest.  It took six-months of diligent, covert investigative work to unravel the defendant's scheme; at any point, had government agents made a mistake, and

accidentally apprised the defendant of the investigation into his
scam, the defendant would have been able to disappear without a
trace.

In sum, the defendant's scam was not an isolated instance of
greed, or the hastily executed work of a drug-addled novice; it was
the full-time operation of a professional fraudster who spent day
after day devoted to one thing: ripping off thousands of small
businesses and doing everything possible to get away with it.  Such
criminal sophistication and premeditation demands a significant
sentence.

**C.  History and Characteristics of the Defendant**

The defendant's crimes are further aggravated by the simple fact
that the defendant is a repeat offender.  The defendant was charged
in Los Angeles County Superior Court in 2010 with grand theft and
sending misleading solicitations.  The charges related to another
mass mailing scam the defendant operated, the Homeowner Property Tax
Review Board.  The scam was similar to the instant trademark scam:
the solicitations made fraudulent offers of services the defendant
had no intention of delivering, and tried to deceive recipients into
believing the solicitations were official in nature.  The defendant
obtained a favorable deal in that case, pleading guilty to a
misdemeanor charge of sending misleading solicitations and receiving
a sentence of probation and community service.  The only lesson the
defendant appeared to have learned from this prior conviction was the
lengths he would need to go to hide his involvement in the next scam.

The defendant tried to obscure this past in his written
statement to the probation office.  Attempting to explain his current
offense, which began in 2013, three years after his prior case – and

13

one year after completing probation for that case – the defendant wrote, "At first I felt I was doing no wrong sending out just marketing offers." (PSR, at 9.) Such nonsense is not merely the self-serving minimization this Court is accustomed to seeing; it borders on a willful refusal to accept responsibility for the sophisticated scam the defendant designed and perpetrated.

The defendant has demonstrated a further inability to follow the law, sustaining a number of DUI arrests and reckless and unlicensed driving convictions. While the defendant's past struggle with substance abuse surely contributed to some of these convictions, temporary sobriety and treatment is no guarantee that the defendant will not reoffend. In sum, the defendant's past history bodes ill for his prospects at rehabilitation.

**D.    Protection of the Public from Further Crimes by the Defendant**

At the time of his arrest, the defendant had been a professional fraudster for over five years. Indeed, when he was arrested, the defendant was in the process of executing a new fraudulent scheme: taking out fraudulent lines of credit from banks using some of the same stolen identities he had used in the mass mailing scam. (The first and second superseding indictments respectively charged the defendant with this conduct in Count 12 and Count 16.) His prior mass mailing conviction, the instant offenses, and his demonstrated criminal propensities all establish a high risk of reoffending. He deserves a lengthy sentence to ensure that he is sufficiently deterred.

**E.   Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence**

The sentence must satisfy defendant's need for punishment or rehabilitation, as well as society's need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence.  There is a strong need for the sentence to deter the defendant and others from committing future crimes.  18 U.S.C. §3553(a)(2)(B) (the sentence imposed is required "to afford adequate deterrence to criminal conduct," which encompasses both specific and general deterrence); United States v. Goff, 501 F.3d 250, 261 (3d Cir. 2007).  Courts have noted that "because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  United States v. Livesay, 587 F.3d 1274, 1279 (11th Cir. 2009).

Scams are a particularly pernicious form of financial crime.  They prey on honest people's trust, on their desire to believe that most people are well intentioned.  Scams deplete the faith people must draw on to operate in a market economy.  While the elderly and vulnerable are the usual victims, even savvy entrepreneurs and small businesspeople, as was the case here, can be deceived.  The USPTO has indicated that trademark scams like the defendants' are a scourge on their operations and registrants, and often lull trademark holders into missing important deadlines and filings for their actual registrations.  See "Caution, misleading notices," U.S. Patent & Trademark Office, https://www.uspto.gov/trademarks-getting-started/caution-misleading-notices (last visited, Aug. 2, 2017). And

because investigating and prosecuting scammers requires significant time and resources, many are never caught.  A significant sentence is therefore needed to send a message to those individuals that the potential risk if they are caught is just not worth it.

Importantly, the defendant also exploited and corrupted the U.S. banking system to perpetrate his scam and launder his illicit proceeds.  He used other people's identities to open accounts they had knowledge or control of.  He paid a branch manager a portion of the proceeds to carry out the laundering transactions.  Had the defendant not had insider's access to the banking system, he would have been unable to make any money from the mass mailing scam.  A stiff sentence is needed to deter those who would attempt to corrupt the banking system.

Accordingly, a sentence within the Guidelines range is necessary to provide specific and general deterrence.

### F.   Combined Analysis

Considering all of the above factors, the government recommends that the Court sentence the defendant to a sentence at the bottom of the Guidelines range of 188 months.  Such a sentence adequately addresses the seriousness of the defendant's conduct, his past conduct, and the need for specific and general deterrence.

## VI.  RESTITUTION

The defendant is liable for $1,557,979.73 in restitution, $1,048,069.73 of which is joint and several with Albert Yagubyan, and $1,281,024,73 of which is joint and several with Orbel Hakobbyan. *See* PSR at 23.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 188 months' imprisonment, 5 years of supervised release, restitution in the amount of $1,557,979.73, and a $200 special assessment.

Dated: August 08, 2017            Respectfully submitted,

                                  SANDRA MOSER
                                  Acting Chief, Fraud Section
                                  Criminal Division
                                  U.S Department of Justice


                                  _____/s/_____
                                  WILLIAM E. JOHNSTON
                                  ALISON L. ANDERSON
                                  Trial Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

17